## National Linen Supply Co. v. Snowden et al.

Nov. 21, 1941.

Golden & Lay for appellant.

Charles B. Upton for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellees sought damages of appellant for injuries resulting from a motor vehicle collision. The two cases were heard together, the jury awarding $2,990, the total asked in each case. The collision occurred October 13, 1939, on Highway No. 25-W south of Williamsburg, to which place Snowden and Goins had started to mail a letter. To reach Williamsburg they had to drive out a narrow neighborhood road, entering the 18-foot wide highway at right angle. Goins said that one driving out the side road could see approximately 600 feet up the road. The highway is straight for this distance, but from this point toward Williamsburg there is a curve toward the west near the top of the hill, 885 feet from the side road.

Goins, driving an old model car, came out to the highway about 7 p. m. He said that within 12 feet of the highway he stopped, looked both ways, saw no lights, then pulled across the highway to his right side and headed towards Williamsburg. He saw the lights of the truck as he made the turn to the north, "It looked like it was in the middle of the road, wobbling from one side of the road to the other." He said he had proceeded about 48 feet from the side road when the truck came right at him, struck his car near the left front wheel and fender, and truck and car went over an 18-foot embankment.

Snowden corroborates Goins, both of whom say that after the impact neither knew anything until they "woke up" in the hospital. It is undisputed that the truck and car went over an embankment on the right side of the

road, the car landing on the side of the truck. The exact point where the vehicles went over is disputed.

Stewart Gildard was driving the truck and had with him Don Payne, a helper. The truck did service for appellant laundry and had made its trip through Barbourville and Williammsburg, delivering and gathering laundry, and was returning south to Knoxville. The truck was of one and a half ton capacity, loaded with soiled laundry, some on top of the truck, and some in front of Payne's seat. When reaching the top of the hill Gildard changed gear and started down. He could not then see far down the hill, due to the curve near the top. When he rounded the curve and got on the straightaway, he saw the glimmer of lights from another car approaching him. "It looked like it was at the bottom of the hill," which he judged was three or four hundred feet away; this was another truck. He dimmed his lights, but he does not say the truck passed. He says he knew of the side road near the bottom of the hill, but did not think it was in regular use for traffic.

Snowden and Goins thought the truck was making fifty or more miles per hour. Gildard said this was wrong since his truck was governed to 45 miles, and was making not over 35 miles. After dimming his lights he "looked up" and saw the car coming out of the side road; it "seemed like I was right on the side road, probably 25 or 30 feet," and when he saw the car coming out "it seemed like it jumped out before me; didn't have much time, just cut and put on the brake and cut to the left."

When the impact came Goins' car was "broadside across the road," and the front of the truck hit it "on the left front door." His truck "winded over;" went over the fill, and the car landed on the "side of me." He held his wheel, and after landing got out and looked for his helper, who was knocked out of the truck when the impact occurred. At this point he says that the truck he had seen, passed after he had gotten out of his truck, and he waved it down. He says he had just a second to act after he observed Goins' car, remembering Payne saying, "watch out." Payne did not corroborate this statement.

On cross-examination Gildard says the car was not entirely on the left but "they were in the center;" that

after coming through the cut (second curve) he could see the side road, which he judged to be two or three hundred feet away, but he did not recall whether he could see a car in the entrance of the road, but thought it was possible. He insisted he put on his brake about 30 feet from the mouth of the road, and hence could not have made skid marks for a distance of 50 to 60 feet above the road; that the highway showed one skid mark on his right hand for a distance of 30 feet above the point of impact, which stopped when the impact came. He thought the one skid mark was due to the heavier weight on one side of his truck.

Payne, the helper, does not throw much light on the matter. He knew of the side road. He though Gildard was making 25 to 30 miles per hour. He said: ''It seems to me like we saw the flash of a light—looked like a headlight of a car disappeared and then didn't see it.'' This was ''150 feet from the cross road.'' From this point his testimony is not enlightening, since just before the collision he was ''looking down at the dashboard and heard the driver yell. I glanced up and about that time we hit the car.'' He says, ''Our right wheels were two feet from the side of the pavement on the right side; the car was angling across in front of us,'' within ''three or four feet of our bumper.'' He thought the collision happened ''about 10 feet this side of the road,'' and the cars went over the bank 10 or 12 feet down the highway; the ''momentum of the truck'' carried them to the left to the point where they went over.

Arthur Rains lived near the place of the accident. He went to the scene and made an examination ''shortly after the collision.'' There appeared to him to be one skid mark up the hill, ''like a brake had been put on.'' This mark ''looked like it was in the center of the road, and gradually veered to the left all the way down until it went over the fill.'' He saw it again the next day, and says ''At the end of the skid mark and before it went over the fill there were some holes knocked in the pavement, on the left side.'' He saw no marks at the mouth of the road nor any going south. The skid marks began 50 feet up the highway from the dirt road. Other witnesses testify to substantially the same, varying the length of the marks, and some saying they saw broken glass 50 or 60 feet north of the road entrance, on the right side.

Kye Shelly, for defendant, claims that he was about 150 or 200 feet south in his truck when the collision took place; he saw the truck coming and dimmed his lights and "he dimmed his." After that "I saw the truck heave to one side of the road and the collision came. It looked like the little car he hit was a little across the center of the road; it came out of the side road angling ahead of me, and headed toward Williamsburg. It looked like the truck hit the front end; kindly angled to the front and side. The little car was right at the mouth of the road."

Other witnesses who went to the scene shortly after the accident, and some who made examinations on the following morning, testified as to the skid marks and "scuffle" marks. There was considerable speculation as to whether the "scuffle" marks indicated where the cars went over the embankment, or where the impact occurred. The proof also led to conflicting distances in regard to skid marks; whether they began at 30 or 40 feet above the road, or at a greater distance, of course affecting the testimony of the driver of the truck and of Goins and his companion. However, since we have concluded the judgment must be reversed we shall not further detail the testimony.

It is not contended that the verdict is excessive, nor could it well be so argued. Both appellees apparently suffered severe injuries. Appellant's contention is that Goins' negligence was the sole cause of the accident, which could not have occurred in the manner detailed by Goins and Snowden because physical facts completely demolish their testimony; that their version was totally at variance with physical and mechanical laws. Louisville Water Co. v. Lally, 168 Ky. 348, 182 S. W. 186, L. R. A. 1916D, 300; Webb v. Elkhorn Mining Corp., 198 Ky. 270, 248 S. W. 844; Cochran's Adm'rs v. Chesapeake & O. Ry. Co., 232 Ky. 107, 22 S. W. (2d) 452.

There are several photographs of vehicles in the record handed to the jury, which show their condition after the collision. It is argued that observing these, together with some oral testimony, it is apparent that the truck struck the car as detailed by Gildard, who said the car was "directly broadside" in the road, and that he hit the "motor by the left hand side; I hit him on

the left front door,'' rather than as said by Goins. Goins did not say that the truck and car met ''head on.'' What he did say was that his car was struck on the left side near the left wheel and fender, the truck veering to the left. As we view these exhibits we are unable to say that they show that appellee's testimony as to the manner of collision was physically impossible.

This picture evidence was, as held in many of our cases, persuasive, but to be treated as showing circumstances to be considered along with the evidence of eyewitnesses, the latter carrying the greatest weight. Evans v. Crusott, 265 Ky. 693, 97 S. W. (2d) 569. Where the physical facts and the testimony are not so diametrically opposed as to make the verbal testimony unbelievable the jury has the right to give weight to the testimony of eyewitnesses. Hayes Grocery Co. et al. v. Fortney's Adm'r, 277 Ky. 441, 126 S. W. (2d) 864.

This brings us to a discussion of technical objections interposed. One witness was pressed considerably on the question as to whether or not he had made a written statement previous to the trial, and in such a way, defense counsel contends, as to get before the jury the idea that appellant was protected by insurance, citing Kentucky Wagon Co. v. Dugancies, Ky., 113 S. W. 128. Prejudicial error was not committed in this respect. Marsee v. Johnson, 260 Ky. 615, 86 S. W. (2d) 299, but on another trial, unless the statement be in other respects shown to have relevant bearing, reference to it should be excluded.

The next complaint relates to an alleged prejudicial instruction. Each party offered six or more instructions, all of which the court gave over respective objections. The criticised instruction tendered by plaintiff, given in each case, reads in part:

''No. 1. The court instructs you that it was the duty of the driver of defendant's truck at the time and place referred to in the evidence to have his truck under reasonable control, and in operating his truck on a straightaway unobstructed highway, down a steep grade where the collision is said to have occurred, and in meeting the car in which the plaintiff Goins was riding and driving, not to exceed a speed of thirty miles per hour, and to keep

on the right side of the road and keep a lookout ahead, * * * and if you believe from the evidence that the driver of defendant's truck failed in any one of these duties * * * you should find for plaintiff, unless * * *.''

It is argued by appellant that this instruction in part was not authorized since it followed Section 2739g-39, Kentucky Statutes 1936, which provided in part:

"Vehicles proceeding from opposite directions shall pass each other to the right, each giving to the other one-half of the road as nearly as possible, (and neither proceeding, when on a straightaway, unobstructed highway, at a greater rate of speed than thirty miles per hour; or, when meeting on a sharp curve or steep grade or bridge, at a greater rate of speed than twenty miles per hour.)''

As is correctly contended, this section was amended by an Act of 1938, now Section 2739g-39, Supp. 1939, which omits the portion embraced in parentheses. The accident here occurred in October, 1939, and the instruction was erroneous in following the law as it appeared in the 1936 statute. Counsel for appellees contend that the instruction was not prejudicial, since, while following the language of the old Section 2739g-39, it limited the speed to thirty miles per hour, rather than twenty, as provided in the old act, and suggests that Subsection 2 of Section 2739g-51, Kentucky Statutes 1936, applies:

"Where a highway passes through the residence portion of any city or town or around any sharp curve, or on a steep grade in or outside of such city or town, if the rate of speed of passing automobiles exceeds thereon twenty miles an hour it shall be prima facie evidence of unreasonable or improper driving.''

While Section 2739g-51 was also amended by the 1938 Act in other particulars, it carried the above provision but omitted Subsection 4 et seq., which related to speed of trucks while being operated in named places under named road conditions, based on truck weight. In Hopper v. Barren Fork Coal Co., 263 Ky. 446, 92 S. W. (2d) 776, 781, we said in regard to an instruction relating to duties of a driver of trucks in respect of speed:

"Another instruction improperly defined his duties

respecting his operating the truck at a speed exceeding twenty miles an hour. Manifestly, it was given under the authority of Subsection 4 of Section 2739g-51, Kentucky Statutes. So much of Subsection 4 of Section 2739g-51 as prescribes the rate of speed for the operation of trucks was repealed by * * * Section 2739g-86, Baldwin's Supp. 1933. The Act of 1932 of which this section is a part especially repeals all laws and parts of laws in conflict with it. Inasmuch as Section 2739g-86 fixes the rate of speed for operating trucks on the highway, it necessarily conflicts with the similar provision in Section 2739g-51 (Kentucky Statutes Supp. 1933).''

The section immediately referred to above is not mentioned in the Act of 1938, but appears in Kentucky Statutes 1936 (Section 2739g-86), as a part of the Act of 1932, and provides:

''No person shall operate any motortruck * * * on any highway outside cities * * * at a greater speed than thirty miles per hour, if its gross weight, including load, exceed Five thousand pounds, or at a greater speed than forty miles per hour, if its gross weight, including load shall be Five thousand pounds or less.''

In Nehi Bottling Co. v. Flannery, 264 Ky. 68, 94 S. W. (2d) 297, 299, we referred to the Hopper case, supra, and wrote:

''Section 2739g-39 governs the operation * * * of all motor vehicles 'proceeding from opposite didections,' and Section 2739g-86 now governs those named in it and fixes the rate of speed at which they may be operated, when not proceeding from the opposite direction of another motor vehicle on the highway. The unrepealed portion of Section 2739g-51 applies only to motor vehicles named in it; i. e., Subsections 1, 2, and 3, when not proceeding as described in Section 2739g-39.''

As we analyze the Hopper and Nehi cases we gain the impression that a truck operated on the highways may, if it weighs less than 5,000 pounds gross, on a bridge, round a sharp curve or on a steep grade, in meeting or passing another vehicle, proceed at a rate of 40 miles per hour, provided it keep on its side of the

road, yielding one-half (Section 2739g-39) and exercise ordinary care for others using the highway. This, notwithstanding the duty is imposed on drivers of vehicles other than trucks, being operated on grades, curves, bridges, passing, or meeting, to observe the limits provided in Section 2739g-51.

We cannot conceive that the lawmaking body intended this to be the law of the road. In the first place we are of the opinion that Section 2739g-51(2), 1938, applied to the appellee's truck driver at the time and place where the accident occurred, and that the limit of speed at which its operator might proceed was 25 miles per hour. This section undoubtedly applies to all classes of motor vehicles. Section 2739g-1.

We reviewed the Hopper case in Meriweather's Adm'x v. Pickering, 273 Ky. 367, 116 S. W. (2d) 670, 673, and while it was not necessary in that case to attempt to "admeasure the repealing scope and effect of the Hopper Case," it is clear that there was a lingering doubt as to its correctness. We referred to the Nehi and Hopper cases in Pickering v. Simpkins, 271 Ky. 288, 111 S. W. (2d) 650, 651, saying:

"The statute makes the proof of speed of a passenger automobile [at] greater than certain rates at different places only prima facie evidence of negligence (Section 2739g-51) but, as to motor trucks of the weight and at the place involved in these cases, the statute makes a speed greater than 30 miles an hour an absolute violation of the law. Section 2739g-86."

In the above case two motor trucks were involved, and the accident occurred on a grade and curve; both trucks were heavily loaded, and were being operated outside a city or incorporated town. We applied the 30-mile limit, which apparently applies in all operations whether on a curve, grade or straightaway, outside cities, which we think was a correct application under the facts there shown. In the Hopper and Nehi cases there was no showing apparently, of weight, curve or grade, hence so much of what is said with relation to speed at points other than on straightaways is dictum, and should not be followed, where the facts show other conditions of the highway, such as curves, bridges or grades.

It is apparent if Subsections 1, 2 and 3 of Section 2739g-51 have no application, then appellee's truck, which is not shown to have weighed gross as much as 5,000, had the right to proceed down a steep grade, if it was such, at any speed not to exceed 40 miles per hour. Under the circumstances of the case, the instruction given would have been correct as to speed of appellee's truck, if there had been proof of excessive gross weight. However, we are of the opinion that since Section 2739g-86 was only intended to limit the maximum speed at which trucks of the weight mentioned should be legally operated, where none of the conditions existed as described in Subsection 2 of Section 2739g-51, it applies to all motor vehicles when passing at places mentioned therein.

If it appeared that appellee's truck weighed over the limits fixed in Section 2739g-86, then the court could have well instructed as he did, apparently making the excess of speed ''an absolute violation of the law.'' In the absence of such proof, and since this subsection (2) makes the rate of speed in excess of 25 miles per hour, only prima facie evidence of unreasonable driving, instruction No. 1 was erroneous, because the court made the speed of the truck absolute violation.

We held in the case of Utilities Appliance Co. v. Toon's Adm'r, 241 Ky. 823, 45 S. W. (2d) 478, 479, Section 2739g-51 (in connection with Section 2739g-65) to be a punitive statute, ''but, like its predecessors, is also a rule of evidence creating a presumption of negligence based upon improper driving,'' and held erroneous an instruction which made the excessive speed absolute evidence of negligence, the effect of the statute being to cast upon the operator the duty of overcoming the presumption, and we laid down what was then considered to have been a correct instruction under Section 2739g-51.

We added to the instruction given, after defining the duties of the operator of the offending car, the jury's duty if they believed the car exceeded the fixed speed limit, and that the speed was the proximate cause, ''Unless you shall believe from the evidence that considering the traffic and use of the street at the time and place, the speed of the car, although exceeding 20 miles per hour, was not unreasonable or improper driving, in which event you will be governed by other instructions given you.''

In Nowak v. Joseph, 275 Ky. 470, 121 S. W. (2d) 939, 940, we determined that where a contributory negligence instruction was given, as was in the instant case, that the instruction in the Toon case was confusing, and might have been simplified by inserting the clause at the end of the instruction, "unless you find for the defendant on the ground of plaintiff's contributory negligence as in Instruction No. ——." The instruction given here by the court is not faulty in the respect noted, unless in the failure to use the words "on the grounds of plaintiff's contributory negligence," as later defined. The instruction which we outlined in the Nowak case is No. 99, Stanley's Instruction to Juries.

Another point raised in brief, and worthy of note, is appellant's objection to the use of the words "steep grade" in the instruction. Counsel for appellant insists in brief that the grade was only a 3 or 4 per cent. grade, basing his assertion on the testimony of some witnesses, while counsel for appellee says that by taking the proof of other witnesses, it was a steep grade, and by his calculation concludes that it exceeded a 17 per cent. grade.

It cannot be assumed that the jury made or was required to make engineering calculations. The matter of guessing at the percentage of grade should not be left to the jury from indefinite proof of witnesses, who may also be guessing. We say this because Section 2739g-1, Kentucky Statutes, specifically provides that:

"Whenever and wherever * * * the words 'steep grade' are used herein they shall mean a grade of exceeding seven per cent."

When it is sought to fasten negligence on one because of improper or unreasonable driving on a "steep grade," neither the witnesses nor the jury should be left to conjecture; there should be proof that the grade in question exceeded 7 per cent.

This brings us to the numerous objections made to argument by plaintiff's counsel in addressing the jury. It would unnecessarily prolong our opinion to recite each one in detail. It is sufficient to say that several of the statements went beyond reasonable bounds, but not to such an extent that we would be justified in holding them to have been prejudicial.

It follows that there was error in giving instruction

386

No. 1, which on another trial should conform to suggestions herein, under developed proof and with reminder to counsel that in argument it is always the best policy to adhere to law and facts.

Judgment reversed, and case remanded for a new trial consistent with this opinion.